# W. H. EDGAR & SON

*vs.*

# IMPERIAL ICE CREAM COMPANY.

*Sale of Sugar—Warranty of Merchantability—Evidence as to
Defects—Declarations of Agent—Evidence of
Authority—Instructions.*

On an issue as to the defective condition of carloads of
sugar sold by defendants to plaintiff, evidence in great detail
as to the condition of other carloads of sugar, from the same
vessel and unloaded by the same lighter, sold by defendants to
others, was improperly admitted, the defects not being shown
to have existed in the same proportion in the various carloads
or in the various bags of sugar, and such evidence, introduced
before any evidence as to the condition of the sugar in contro-
versy, being likely to induce a belief by the jury that defendants
were engaged in selling defective sugar.          pp. 638-641

That one paragraph of the contract of sale read "550 bags
of Java white sugar at 26.25 per hundred pounds, F. O. B. New
York, plus ruling New York prepaid freight rates," did not
show that the vendors' obligation as to delivery ended at New
York, a subsequent paragraph reading, "Seller's obligation as
to delivery is completed upon presentation at the bank" of
"specified copies of invoices supported by bills of lading prop-
erly endorsed."          pp. 641, 642

A report made to defendants by their agent as to the condi-
tion of sugar sold plaintiff by defendants *held* properly exclud-
ed, when offered during the cross-examination of a witness who
was not shown to have known anything about it or to be in any
way connected with it.          p. 642

A representative sent by the vendors of sugar to ascertain
the ground of the purchaser's complaint of the sugar, and to
report to the vendors in regard thereto, *held* not authorized to
bind the vendors to pay for sugars rejected by the purchaser,
or to prepare a statement of indebtedness by the vendors to the
purchaser on account of defects in the sugars.          pp. 643-646

Where it was sought to bind the vendors by the statements of a representative sent by them to examine the sugar of which the purchaser complained, it was error to exclude evidence offered by such vendors as to the character of the instructions given such representative, they having done nothing to induce a belief by the purchaser that such representative had authority for the purpose of such statements.                    pp. 643, 646

In an action by a purchaser of Java sugar to recover from the vendors on account of defects in the sugar, *held* that testimony by plaintiff's witness that wet or damp sugar was not merchantable was sufficient evidence of lack of merchantability to go to the jury, defendants conceding that such was the condition of the sugar, while contending that this was the case with all Java sugar.                    p. 647

Evidence as to the wet and lumpy condition of the sugar, and that this arose from external causes, *held* sufficient to go to the jury.                    pp. 648, 649

*Decided January 10th, 1922.*

Appeal from the Circuit Court for Allegany County (HEN-DERSON, J.).

Action by the Imperial Ice Cream Company against W. H. Edgar & Son, trading as Edgar Sugar House. From a judgment for plaintiff, defendants appeal. Reversed.

Among the prayers submitted were the following:

*Plaintiff's First Prayer.*—The plaintiff prays the court to instruct the jury that if they find from the evidence that part of the sugar bought under the contract was unmerchantable, by reason of its condition at the time of delivery to the Imperial Ice Company, which was at the time the bills of lading were endorsed over to the plaintiff, then the plaintiff is entitled to recover the value thereof estimated by multplying the number of pounds found to be unmerchantable by the contract price which was 26¼ cents per pound, plus the

632 EDGAR vs. IMPERIAL ICE CREAM CO.

freight paid thereon at the of 27 cents per 100 pounds, plus the war tax on the freight paid thereon at 3%, and if the jury shall further find that there was a difference between the invoiced weight and the weight actually delivered then the plaintiff is also entitled to recover the amount paid for the sugar not delivered, estimated at the contract price of 26¼ cents per pound, plus freight paid thereon at the rate of 27 cents per 100 pounds, plus the war tax paid on said freight at 3%. (With interest, in the discretion of the jury, on the entire amount.)

*Defendants' First Prayer.*—The jury are instructed that no legally sufficient evidence has been offered in this case to show that there has been any breach of warranty on the part of the defendants to deliver to the plaintiff sugar of the kind and quality specified in the contract of sale between the plaintiff and defendants (except as to the five bags admitted by the defendants to be off color) and, accordingly, the jury cannot allow the plaintiff any damages for or on account of any alleged failure of the defendants to deliver to the plaintiff sugar of the kind and quality so specified in said contract, except as to the said five bags admitted by the defendants to have been off color.

*Defendants' Fourth Prayer.*—The jury are instructed that there was no warranty of merchantability in the contract of sale, as shown by the evidence in this case, further than that the sugar to be delivered thereunder was to be of the kind, character and quality specified therein and as saleable as sugar of the kind and character specified in the contract, and the jury are further instructed that the fact that the sugar delivered by the defendants to the plaintiff was not as readily saleable or was not saleable at as high a price as other kinds of sugar or that there was only a limited market or demand for it, is not to be considered by the jury in determining whether the sugar delivered was merchantable, the proper test of merchantability as applied to the circumstances of this case being, whether the sugar delivered was or was not capa-

ble of being sold as being in fact of the kind and character
specified in the contract.

*Defendants' Fifth Prayer.*—The jury are instructed that
under the contract of sale offered in evidence the defendants.
were only required to furnish sugar to the plaintiff which was
of the kind, character and quality known and designated by
those engaged in the trade of buying and selling sugar as.
Java White 25 Dutch Standard, and as to all the sugar which
the jury shall find was in fact Java White 25 Dutch Stand-
ard, they are instructed that the defendants were entitled to
be paid therefor and retain the same, provided that the jury
find that said sugar was merchantable, by which is meant that
it was as saleable as the kind, character and quality of sugar
known and designated as above mentioned, as Java White 25
Dutch Standard.

*Defendants' Eighth Prayer.*—The jury are instructed that
the plaintiff cannot avoid his obligation to pay for sugar fur-
nished by the defendants in compliance with its contract by
reason of any fall in the market price of sugar below the
price stipulated in the contract in this case, no matter how
great such fall in market price may be.

The cause was argued before BOYD, C. J., BRISCOE,.
THOMAS, PATTISON, URNER, STOCKBRIDGE, and OFFUTT, JJ.

*Ferdinand Williams* and *William L. Rawls,* for the appel-
lants.

*Carl G. Mullin,* for the appellee.

BOYD, C. J., delivered the opinion of the Court.

This is an appeal from a judgment rendered in the lower
court in favor of the appellee against the appellants.   There
are two cases which were consolidated, and a verdict was ren-
dered for $8,563.30 and judgment was entered on the 15th
of February, 1921, for that sum with interest and costs.   At-
tachments were issued, and the cases were tried on the short

notes. The one in the record originally contained the common counts, but during the trial it was amended by the addition of two special counts—one being for the alleged defective condition of sugar in a car shipped to Cumberland, and the other being for the defective condition of sugar in a car shipped to Wheeling, West Virginia.

The contract between the parties, offered in evidence, is as follows:

"Seller's Copy from Buyer.

"Contract No. 0-5.                            May 24.

"Sold by W. H. Edgar & Son, of Detroit, Michigan, to Imperial Ice Cream Co., of Clarksburg, W. Va., 550 bags of Java white sugar at 26.25 per hundred pounds, F. O. B. New York, plus ruling New York prepaid freight rates, net cash, payable in Detroit at bank specified below, on presentation of bills of lading supported by invoices.

"Bags of approximately 224 pounds each.

"Ex-Java afloat, due to arrive late July, early August, 1920. Sellers' obligation as to delivery is completed upon presentation at the bank below specified copies of invoices supported by bills of lading properly endorsed. Complete and final shipping instructions to be furnished in writing to seller at least fifteen days prior to time of shipment, with the exception that the seller reserves the right of routing shipments at his discretion.

"Terms of Payment: Buyer agrees to open immediately a confirmed irrevocable banker's credit for the entire amount of this contract to the order of W. H. Edgar & Son, with the First and Old Detroit National Bank, Detroit, Michigan, subject to sellers' original contract, and subject to strikes, fires, transportation and business conditions, and other extraneous causes which render performance commercially impracticable.

"All additional duties, excise or other taxes hereafter levied on the raw or refined sugar necessary to

fill this contract at buyer's expense in addition to price specified.

"Buyer's Signature: Imperial Ice Cream Co.,
"W. M. B. Sine.
"Sellers' Signature: W. H. Edgar & Son,
W. P. Turner.
"Broker: Willison, Earle Co."

There appears in the record a note which shows a change in the contract in reference to the terms of payment. It is as follows:

."Note.—The defendant admits for the purpose of the record that the sugars in question were shipped to the plaintiff F. O. B. bill of lading attached to sight draft instead of an irrevocable letter of credit. The method of payment was changed by agreement of the parties, and the letter of credit feature was eliminated by mutual consent."

There was a memorandum of sale made by the broker three days before the contract was dated, which differs somewhat from the contract, but as the latter was signed by the parties, we must be governed by that. Three cars of sugar containing in the aggregate five hundred and fifty bags were shipped to the appellee under the contract—two to Cumberland and one to Wheeling, but only one of those shipped to Cumberland was opened or paid for by the appellee, who paid the appellants for the sugar in the two cars, and is endeavoring to recover back from them what it claims to have been improperly collected. The amounts claimed by the appellee are thus stated in the record:

"Wheeling Plant,
"Imperial Ice Cream Company,
"Wheeling, W. Va., Sept. 3, 1920.
"Sold to W. H. Edgar & Son, Detroit, Mich.:
"Claim for shortage, off color, damp, wet and lumpy Java sugar. Your invoice dated Aug. 5, 1920, Car No. Sou. 133311. Total involved weight, 183

bags, 224 pounds, 40,992 pounds; total net weights received (affidavits enc.), 39,182½; total net shortage, 1,809½ at 26½ ...................... $474.99

"To freight on shortage, New York to Wheeling, 27. ..........................   4.88

"To 3% war tax on freight on shortage.....   .14

"To labor, weighing and marking, net weights on each sack, 20 hours...............  10.00

"To bags refused account off color, 2, 448 lbs.; to bags refused account lumpy, 11, 2,464 lbs.; to bags refused account damp, 50, 11,200 lbs.; net amount, 14,112 lbs., 26¼. .............................. 3,704.40

"To freight, New York to Wheeling, on refused sugar, 14,112 lbs., 27............  38.10

"To 3% war tax on freight on refused sugar   1.14

"To labor inspecting and sorting entire shipment, 12.50. .......................   6.00
                                          _____
                                          $4,239.65

"Inspection and weights verified by Vincent H. Carr, Daub & Carr Co.; Michael J. Brophy, G. J. Hoffman & Co."

The claim for the Cumberland car is substantially the same, except the net shortage is only 511 pounds, and the bags refused on account of color were 3, on account of being lumpy 4, and on account of being damp, 63. There is also a difference of $15.00 in the claim for labor and some difference in freight war tax, etc. The total claim for the Cumberland car was $4,323.64.

It will be seen that the verdict rendered was for the exact sum of the two statements, and hence the action of Messrs. Carr and Brophy becomes important, as will appear later. The appellants admitted that five bags of sugar, out of the 366, were not up to the specifications of the contract as to color, and that there was a shortage of 2,330½ pounds. There are twenty-five bills of exception in the record. The first

nineteen embrace rulings on the admissibility of evidence and motions in regard to them, the twentieth presents the rulings on the prayers, and the other five are special exceptions to certain prayers.  While we will not attempt to discuss each of the exceptions separately, we will for the most part refer to them in their numerical order.

The first, second, and third can be considered together.  In addition to the 550 bags of sugar sold to the appellee by the appellants through their brokers, there was also sold to the Morris Grocery Company of Clarksburg, W. Va., Horner, Gaylord Company of Clarksburg, and other parties, some of the same shipment of sugar.  The evidence shows that the sugar came to New York on a vessel named Chipania, and was unloaded in the New York harbor, Pier 32, North River. What is spoken of as Baltimore & Ohio Lighter No. 120 carried fourteen hundred bags of the sugar from the steamship pier to Baltimore & Ohio Railroad Company docks at St. George, New York, and from thence they were shipped in cars as follows: 400 bags in two cars to the Morris Grocery Company and 250 bags to Horner, Gaylord Company; 184 bags to the appellee in one car, directed to Parkersburg; 183 bags in a car directed to Cumberland; and 183 bags in another car directed to Wheeling.  The one to Parkersburg was subsequently directed to be sent to Cumberland, but it was not opened or accepted by the appellee.  As it is said that there were fourteen hundred bags carried on that lighter, there was apparently another carload of two hundred bags, but we do not find anything in the record to show to whom it was sent.  It is claimed by the appellee that the sugar it received was defective, some in color, some was damp, and some wet.  The witnesses referred to in the first and third exceptions testified over the objection of the defendants as to the condition of the sugar received by those parties in Clarksburg, and the second exception was to the refusal of the court to strike out the testimony on that subject, offered in the first exception.  The court admitted the testimony on

the proffer of the plaintiff to follow it up by showing that it was in the same condition in New York.

The theory of the plaintiff in offering testimony as to the condition of the sugar received by the parties in Clarksburg was that, as all of it came from the same vessel to New York, was loaded on the same lighter, and carried to the Baltimore and Ohio docks, and that the condition of all on that lighter was of the same general character, it reflected on the condition of the sugar shipped to the appellee. Mr. Willison, of the firm of Willison, Earle Company, brokers at Clarksburg, was the first witness called by the plaintiff. He testified that he had sold for the Edgar Sugar House, in May, 1920, "Java White Granulated Sugar." The contract signed by the parties does not use the term "granulated" but while there was a good deal of discussion about it in the record and at the argument, it does not seem to be necessary for us to speak of it at length.

The witness Willison, after some further objection and discussion, was asked, "What can you state to the jury about the condition of the sugar on its arrival?" The court said: "This has reference to the condition of the sugar in Clarksburg, and they will have to follow that up by showing that it was in the same condition as when it arrived in New York. That will be admitted." The witness was then permitted to answer the question, and he said: "A. I examined a great many bags of both these lots of sugar of the Horner-Gaylord and the Morris Company, and I found some of the sugar to be mighty fine sugar. Some of it I found to be mighty fine free-running sugar; nobody could complain about that; nice, white granulated sugar in perfect merchantable condition. Some of the sugar was a little bit off-color; it was lumpy; very hard lumps; some of it was damp, of the balance, thirty or forty per cent. seemed extremely wet, so wet that water was running out of it, and a syruppy syrup could be seen on the floor. That was my examination of the sugar; they were practically identical in per cent and kinds."

The overruling of the objection to that question, and permitting the witness to answer as above, constituted the ruling in the first bill of exceptions. Then, after Mr. Willison was examined at some length, Mr. Morris was permitted to testify as to the condition of the sugar his company received, which was admitted subject to exception, and Mr. Gaylord testified as to the condition of that which his company received. That was presented by the third bill of exceptions. As we understand them, the objections of the defendants were two-fold. They contended that the sugar was sold f. o. b. New York and hence evidence as to its condition elsewhere was not relevant or admissible, and that the evidence in reference to that sold the parties in Clarksburg was also inadmissible for other reasons. Passing for the moment the question of when the liability of the defendants ended, whether at New York or at the places to which the sugar was shipped, it is evident that it was very difficult to avoid injury to the defendants by having testimony in great detail, as it was, of the witnesses as to the condition of the sugar sold to other parties and delivered in Clarksburg. While testimony subsequently admitted does tend to show that some of the bags were dirty, some damp and wet, and that some of the sugar was damp, some wet and some very hard, and that the bags complained of were scattered throughout the piles on the docks and on the lighter, and were not separated in the cars, it would be impossible for the jury to say that the same proportion of defects existed throughout the different shipments. It is only necessary to compare the statements of the car unloaded at Cumberland with the one at Wheeling by the plaintiff, to show that the alleged defects in the sugar did not run evenly in the cars. For example, in the Wheeling car the net shortage in weight was 1,809½ pounds, while in the Cumberland car it was only 511 pounds; in the Wheeling car there were eleven bags refused because they were claimed to be lumpy, while there were only four in the Cumberland car; and in the Wheeling car there were fifty bags refused on ac-

count of being damp, while in the Cumberland car there were sixty-three bags refused for that reason.

If the witnesses had been confined entirely to general conditions, to the effect that some of the bags were dirty, some of the sugar damp, etc., it might have been admissible on the theory that all of the sugar came out of the same ship and lighter, but we cannot agree with the appellee that there was no injury in permitting the witnesses to go into such great detail as to the sugar which the two firms at Clarksburg received. Mr. Willison's testimony above shows how radically different the various bags of sugar were—some were "mighty fine," some "a litttle bit off color." some was "lumpy, very hard lumps," some of it damp, "of the balance, thirty or forty per cent seemed extremely wet." Mr. Morris testified that something like thirty per cent. of what his company got was unmerchantable, and that the bags were nearly all short; that part of it was lumpy. "They were so hard that you could not mash them without using a hammer, but there was not a great deal of it in that condition." And he went into quite a full explanation of the condition of their sugar. He admitted that he had never before had any experience in buying imported sugar.

Mr. Gaylord said his firm had bought twelve hundred and fifty bags of that sugar and he thought it came in about six cars. He testified that what they got "was wet, damp and dry, part of it. Part of it was very nice." And he explained the conditions very fully. It will be noticed that the Horner-Gaylord Company bought twelve hundred and fifty bags, which added to what the Morris Company and the appellee bought, far exceeded fourteen hundred bags, which were proven later to have been brought over on the Baltimore and Ohio lighter. It is said in 10 *R. C. L.* 928: "It is well settled that if the evidence offered conduces in any reasonable degree to establish the probability or improbability of the fact in controversy, it should go to the jury. It would be a narrow rule, and not conducive to the ends of justice to exclude it on the ground that it did not afford full proof of

the non-existence of the disputed fact. Evidence upon a collateral issue may be relevant, if the fact which it tends to establish will tend to prove or disprove the fact in issue." The author cites in the notes *Dougherty* v. *White,* 2 Boyce (Del.) 316, which refers to *Lee* v. *Tinges,* 7 Md. 215, 236; and *Brooke* v. *Winter,* 39 Md. 505, 508, amongst other cases. The author in 10 *R. C. L.* goes on to say: "But to render evidence of collateral facts competent, there must be some natural, necessary, or logical connection between them and the inference or result which they are designed to establish." The evidence of the condition of the sugar purchased by these parties in Clarksburg doubtless did have a damaging effect on the defendants before the jury. It was introduced before there had been any evidence offered of the condition of the sugar in controversy and, while the order in which testimony is offered must be left largely to the parties, this evidence prepared the minds of the jurors for a ready belief that the appellants were engaged in furnishing bad lots of sugar. But no one could tell or form any definite idea of the amounts of what the appellee called "defective" sugar, which it had received, by the testimony of the condition of the sugar sold to parties elsewhere. While we would hesitate to reverse this verdict for error in these three exceptions, if there was nothing else, as there must be a reversal for other reasons, it is proper to say that the appellee should not be permitted to go into such details in reference to the sugar shipped to the two firms in Clarksburg.

We do not agree with the contention of the appellants that, under the contract, they were not responsible for the condition of the sugar beyond New York. It seems to us that the language of the contract itself clearly shows that the appellants' obligation as to delivery was not ended at New York. It is said in 35 *Cyc.* 174: "Similarly, if the agreement is to sell goods f. o. b. at a designated place such place will ordinarily be regarded as the place of delivery; but the effect of the f. o. b. depends on the connection in which it is used, and

if used in connection with the words fixing the price only, it will not be construed as fixing the place of delivery." In this case the language of the contract seems to indicate that the parties were using the term in fixing the price. The seller was to be entitled to 26.25 per hundred pounds f. o. b. New York, plus ruling New York prepaid freight rates. That portion of the contract was providing for the cost of the sugar, and then further on, it referred to the question of delivery and said seller's obligation as to delivery was not to be completed until copies of the invoices, and the bills of lading properly endorsed, were presented. The contract was changed from the irrevocable bankers' credit at the bank named, so that the sugar was "shipped to the plaintiff f. o. b. bill of lading attached to sight draft instead of an irrevocable letter of credit." We do not think that the provisions of the Uniform Sales Act, article 83, section 41, sub-paragraph (2) and section 43, sub-paragraph (a) of our Code, affect the question, but by a proper construction of the contract which the parties made, we are satisfied that not only did the property not pass out of the seller at New York, but the seller's obligation as to delivery was not completed until the invoices, supported by the bills of lading properly endorsed, were presented at the bank.

We do not understand how what purports to be a certificate from Messrs. Carr and Brophy, dated September 13, 1920, was admissible—especially at the time it was offered, which was during the cross-examination of G. H. McDonough, who was not shown to have known anything about it, or to be in any way connected with it. It was not even shown that that was a report for which the appellants were waiting. It is true that there was a proffer to follow it up by showing that "it is an affidavit made to W. H. Edgar and Son" but it is not even an affidavit, and, regardless of any other question, it had nothing whatever to do with the cross-examination of Mr. McDonough. From what we have already said, it will be seen that we do not think there was any reversible error in the fifth, sixth or seventh exceptions.

The eighth exception presents the ruling of the court in striking out all the evidence of the witness C. R. Grimes relating to Baltimore and Ohio car 89368, which was the one not accepted. On motion of the plaintiff that testimony was stricken out, and we do not understand why that was done, but we do not see how the defendants were injured and hence there was no reversible error. The answer in the ninth exception was not admissible, but the court struck out in the tenth exception the objectionable part, and the rest could do no harm.

The thirteenth bill of exception presents a more serious question. The proffer of the defendant was to prove by Mr. William G. Daub what instructions were given Vincent Carr by the witness, who was a member of the firm of Daub, Carr & Company. The ruling was that "this evidence of the authority of Mr. Carr from Mr. Daub is not admissible, unless it is proffered to show that it was communicated to the plaintiff by act, word or deed." The learned judge doubtless had in mind a rule of law applicable to the relation of principal and agent which cannot be questioned, and the appellee refers to *Lister v. Allen,* 31 Md. 543 in support of it. When, in a case like *Lister* v. *Allen,* the principal clothed the agent with apparent muniments of an absolute title to property, the principal would be liable, but this is a very different case from that. The appellants were not doing anything to induce the appellee to enter into a contract, but sent a young man who had been in the employ of the firm of Daub, Carr & Company for a short time, to ascertain the ground of complaint by the appellee and to report to them. It is impossible to understand how the appellee's officers or agents could have believed that the appellants would agree that an employee of another firm should visit the places where the sugar was delivered and not only bind the appellants by his acts, as to the condition of the sugar, but practically as to the interpretation of the contract between the appellants and the appellee. On August 23, 1920, the appellants telegraphed to Willison, Earle Company, upon whom the appellee was evidently rely-

ing, and the same day wrote enclosing a copy of the telegram. In that letter they expressly said "Mr. Carr, from the office of our New York representative, is leaving New York for Clarksburg today, *and we await his report.*" The letter also showed what the appellants contended their liability was, as to the condition of the sugar. Neither Mr. Willison, who was acting for his firm, nor the appellee, could properly have supposed from that letter that Mr. Carr had any authority to do more than examine the sugar and report its condition, and yet we find that the appellee used a copy of the alleged report as its cause of action against the appellant. As we understand the evidence, they were copies signed by Mr. Carr and Mr. Brophy —the originals presumably having been sent to the appellants but could not have reached them when these proceedings were begun in court. The appellees certainly could not have supposed that Messrs. Carr and Brophy had authority to admit liability on the part of the appellants for all that is set out in those accounts, especially as the appellants had definitely informed Mr. Willison of their position in reference to their liability. Willison, Earle Company, as brokers, sold the sugar for the appellants to the appellee and the other parties, and he was undoubtedly right in endeavoring to satisfy the purchasers. But he was then acting for them and not for the sellers, as the sales had already been made. The appellants, however, very properly manifested a willingness to do all they could within reason to protect the purchasers, although they claimed that they were not under legal obligation to do more than furnish the appellee "Java White Sugar" in 550 bags of approximately 224 pounds each, at the price and on the terms named in the contract. Mr. Willison, who was representing his firm, received the telegram and letter of August 23, 1920, and they were put in evidence by the plaintiff. This is his testimony: "Q. Did Mr. Carr come? A. Yes, sir. Q. What did he do after his arrival? Was he introduced or identified in any way? A. Yes, he had a letter of introduction from his firm. Q. What did Mr.

Carr do after he arrived there? A. He helped examine the sugar. Q. Did he make a statement of the condition in which he found the sugar? A. Yes; I was instructed by Mr. Edgar to have him make a statement and take the statement to Detroit, and he took the statement to Detroit as per Mr. Edgar's instructions to me. Q. While that was going on did you or did you not communicate with Mr. Edgar again? A. Right before they started I telephoned Mr. Edgar. Q. State what that conversation was. A. Mr. Edgar told me over the telephone that he wanted to see that these buyers were treated right in every way, but he commissioned me to please do my best to see that the claims were gotten up in a perfect state, so that he would have papers to substantiate his claim against the party from whom he bought the sugar, so that I was very careful to do that. I did my best in that respect."

Again as to Mr. Brophy he said: "Q. Who is Mr. Brophy? A. When Mr. Carr arrived at Clarksburg and examined the sugar and having seen it, he felt that he should call a representative of the people who weighed it or inspected it in New York; that he found it to be different than he thought it was. He had his firm then send on this Mr. Brophy. That was his capacity. He was sent over there at Mr. Carr's request."

On August 27, 1920, Willison, Earle Company received a telegram: "Your day message yesterday cannot intelligently act on Imperial until Carr reports to Detroit, reports to date indicate that sugar grade twenty-five Dutch Standard we are not responsible for dampness caused through sweating in steamship." We find nothing in the record that could have justified either Mr. Willison or the appellee in believing that Messrs. Carr and Brophy had authority to bind the appellants to pay for the sugars rejected because they were damp, wet, or lumpy. Neither of them was a general agent of the appellant, and when they went there as special agents, Mr. Willison, who was representing the appellee, was informed

as to the position of the appellants, and no one could have supposed that Messrs. Carr and Brophy had the power to prepare statements of indebtedness on the part of the appellants to the appellee so that they could be used in the attachment proceedings.  The one at Cumberland is dated September 2nd, 1920, and the one at Wheeling, September 3rd, 1920, when these proceedings were commenced, on September 3rd. In *Brager* v. *Levy,* 122 Md. 560, JUDGE THOMAS, in speaking for the Court, said: "The well recognized doctrine, that a general authority to an agent cannot be limited by private instructions not known to third persons dealing with him, certainly cannot be applied to a case where no such general authority exists.  The general rule is that the power of an agent to bind his principal rests upon the authority conferred upon him by the principal, and persons dealing with an alleged agent are put upon inquiry as to the extent of his authority."  See also *Oxweld Acetylene Co.* v. *Hughes,* 126 Md. 437.  It would place a principal in an awkward position if it could be said that if he sent an agent to a customer to ascertain the ground he relied on for refusing to pay an account, or to recover back what he had already paid, *and then report to him,* the agent could, on such authority, agree to all the claims the purchaser made and that the seller could not prove that the agent had no authority so to act.  In this case there was affirmative proof that Mr. Willison knew that the appellants would wait for the report of Carr before acting. Using a copy of the report, with the meaning the appellee claims is to be attached to it, made it important for the appellants to prove, if they could, that Carr had no such authority, and the evidence offered in the thirteenth bill of exceptions was admissible, and it was error not to admit it.

We cannot see that the appellants could have been injured by the answers to the questions in the fourteenth, fifteenth, sixteenth and seventeenth exceptions.  What is said in considering the first, second and third, is sufficient to show that

there is no error in the eighteenth. We think the motion in the nineteenth was too broad.

This brings us to the prayers. The defendants objected to the first and some other prayers of the plaintiff on the ground that there was no legally sufficient evidence that part of the sugar was unmerchantable. We cannot adopt that view of the appellants. While it is true that there have been shown to be great differences between Java sugar and American sugar, without referring to other testimony, Mr. Gaylord testified that wet or damp sugar was not merchantable. He may have been altogether mistaken, but it was testimony and legally sufficient to go to the jury. By the fourth and fifth prayers of the defendants, which were granted, the jury was instructed as to what was the meaning of merchantable under such a contract. We will ask the reporter to publish those prayers in the report of the case. There can be no valid objection to the plaintiff's first prayer on that ground, and, as we have already indicated, we think that the reference to the time of delivery to the plaintiff as being at the time the bills of lading were endorsed over to it, was correct under a proper construction of the contract. No objection has been urged to the plaintiff's second prayer, and we think there was no error in the plaintiff's third prayer. There was error in granting the plaintiff's fifth prayer, as there was no legally sufficient evidence that the defendants led the plaintiff to believe that they, the defendants, would adjust all loss caused by the sugar being damp, or wet, lumpy, or off color, and that because thereof, the plaintiff was induced to use the sugar which was in a merchantable condition. That prayer was specially excepted to, and should have been rejected. The letter of August 23rd, 1920, to Willison, Earle Company, the telegram of August 27th, and the letter of September 24th, 1920, to the Imperial Ice Cream Company, show that the defendants were denying their liability for dampness throughout, and claimed that they were only responsible for Java White sugar, twenty-five Dutch Standard, which they claimed

are always liable to be damp by reason of the way they were made. The defendants' fifth, sixth and seventh prayers, which were granted, instructed the jury in substance that they were only required to furnish sugar which was of the Java White, twenty-five Dutch Standard. They offered evidenced tending to show that such sugar was known by the trade to have much more dampness in it than American sugar, and that such dampness did not affect its merchantability in the trade. We think that there was error in granting the plaintiff's sixth prayer as amended, as we do not find any legally sufficient evidence to support the contention that the defendants held Vincent T. Carr out to the plaintiff as being their agent for the purpose of adjusting shortage claims estimating the damage to the sugar in controversy, and making disposition of the wet sugar. That was specially excepted to and should have been rejected. What we have said as to the fifth prayer is applicable to the eighth.

There was no error in rejecting defendants' prayers 1A, 1B and 1C. We have been more in doubt about the defendants' first prayer than any other, but after giving the question careful consideration, we have concluded that the court was right in rejecting it. We, of course, have no question about such cases as *Joseph Brothers Co.* v. *Schonthold Co.,* 99 Md. 382; *Hyatt* v. *Boyle,* 5 G. & J. 110; and other cases cited by appellants in reference to that. Nor have we any doubt that from the evidence it is shown that when the appellee purchased Java White Sugar, it had no right to demand a quality of sugar superior to that, but there was some testimony in the case which tended to show that some of the sugar was not in such condition as a purchaser would have the right to expect and demand. There was a great deal of testimony on the part of the plaintiff that some of the sugar was lumpy, some damp, and some wet. The captain of the lighter testified that some of the bags were hardened inside, and he figured by that that they were stained by water. Mr. Geilinger, an employee of the plaintiff at Wheeling, said,

amongst other things: "Some of the sacks were emptied, on the inside of the sacks you could see where the sugar was stuck to the sack just like it would have been if the sack had been wet on the outside." Mr. McDonough, manager of the plaintiff Company, said that some of the bags "were damp and you could squeeze the sugar in your hands and it would make a ball and some of it was hard and lumpy." He said as to the bags, "They appeared, some of them, as if water had been on them." Mr. Trench, production manager of the plaintiff company, who is a chemist by profession, saw the cars at Cumberland and Wheeling and said: "From a superficial examination of it, the sacks, a lot of them, were discolored and in a lot of instances wet, with water standing on them. Whilst not wet on the inside, they showed where they had come in contact with water. A lot of them soaked up so that the molasses or syrups were running out of the sacks onto the floor." Other witnesses for the plaintiff testified as to the bad condition of some the bags of sugar at Wheeling and Cumberland. Mr. Daub, one of the principal witnesses for the defendants, testified that lumps in the sugar in fifteen bags spoken of would affect the market value to some extent on those bags. He said it would make a considerable difference whether the lumpiness was caused by external or internal causes, and in answer to the question "What difference would it make?" replied, "Why, the lumpiness, if a natural lumpiness, is not considered damage; the external would be a damage." Mr. Daub said, in answer to a question as to whether he would pass such sugars as he was asked about in its entirety as Java White, "Such a lot of sugar would have to be passed as Java White Crystal, Dutch Standard Twenty-five, *provided no indication of external damage existed.*" There was some evidence, as we have seen, which indicated external causes, and without referring to further testimony, it is sufficient to say that we think there was enough shown to require the question to be submitted to the jury as to the cause of the conditions. If the conditions were such as some of the plaintiff's witnesses testimony tended to

show, we cannot say, as a matter of law, that all of the sugar sent to Cumberland and Wheeling was such as the plaintiff bought. We are of the opinion, therefore, that the defendants' first prayer was properly rejected. We do not see why the second prayer of the defendants was not granted, unless it was because it was not materially different from the fifth, which was granted, but it instructed the jury in terms that they could not award damages unless they found the facts therein set out. The third might also have been granted, although the substance of it was contained in the defendants' sixth prayer, which was granted. We see no objection to the eighth prayer, but the tenth and eleventh were properly rejected.

It follows that the judgment must be reversed.

> *Judgment reversed and new trial awarded, the appellee to pay the costs above and below.*